The 12701 Shaker Boulevard Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 79847.    Filed May 12, 1961.

*Robert L. Merritt, Esq.*, for the petitioner.

*Charles B. Norris, Esq.*, and *Buckley D. Sowards, Esq.*, for the respondent.

Mulroney, *Judge:* The respondent determined deficiencies in the petitioner's income taxes for the years 1953 through 1956 in the respective amounts of $4,077.32, $8,629.46, $3,503.33, and $4,104.34. Concessions by the parties have eliminated some of the issues. The only issue remaining is whether petitioner is entitled to an amortization deduction of $1,905.85 in 1953 and a deduction of $30,489.82 in 1954 of the unamortized balance of a prepayment penalty paid to a mortgagee in 1949, when the loan was refinanced, in order to prepay the existing mortgage.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

The 12701 Shaker Boulevard Company, hereinafter called petitioner, is a corporation organized under the laws of the State of Ohio in 1944. Petitioner's income tax returns for the years 1953 through 1956 were filed with the district director of internal revenue, Cleveland, Ohio. Petitioner reported its income for these years on an accrual basis.

Petitioner is in the business of owning and operating an apartment building. On November 4, 1947, the petitioner borrowed $800,000 from the Connecticut General Life Insurance Company (hereinafter called Connecticut General) and executed its promissory note in the amount of $800,000, bearing interest at 4 percent per annum, maturing in 20 years, together with an Ohio Mortgage Deed securing said note. The promissory note contained the following prepayment clause:

After January 1, 1948, upon giving thirty (30) days notice in writing, the undersigned is to have the privilege of making additional payments on account of principal, but such additional payments are not to exceed ten per cent (10%) of the original principal amount in any one year. Payments in excess of the

said 10% may be made after the fifth (5th) year with the payment of a premium of three per cent (3%) ; after the tenth (10th) year with the payment of a premium of one per cent (1%) ; and after the fifteenth (15th) year, at par. Additional amounts so paid shall apply on installments of prkncipal [*sic*] in the inverse order of their maturity.

At a special meeting of the petitioner's board of directors held on August 17, 1949, to discuss the possibility of refinancing the 1947 mortgage loan, the chairman of the board stated that negotiations with the Prudential Insurance Company of America (hereinafter called Prudential) for a loan had been successful. The minutes of the meeting stated, in part, as follows:

The Chairman further stated that he had been negotiating with the Connecticut General Life Insurance Company requesting permission to pay off the present mortgage and that he had received a letter authorizing prepayment of the loan with a prepayment penalty of Forty Seven Thousand Eight Hundred Sixty Seven Dollars ($47,867.00). He stated that while this was a great deal of money to pay, nevertheless the increased capital would put the company in a much sounder financial position and further stated that the local office of The Prudential Insurance Company of America had recommended a One percent (1%) payment to help defray the cost of the prepayment. * * *

Petitioner's board of directors, at the August 17, 1949, meeting, adopted a resolution authorizing a loan from Prudential and also adopted a resolution to exercise the option to prepay the existing note and mortgage to Connecticut General and to pay a prepayment penalty of $47,867 or any lesser amount which would be acceptable to Connecticut General.

Petitioner paid the remaining balance of its loan, plus accumulated interest, to Connecticut General, and paid $38,117 as a prepayment penalty to Connecticut General. Prudential paid $9,750 as its share of the prepayment penalty of $47,867.

On August 24, 1949, the petitioner borrowed $975,000 from Prudential and executed and delivered its promissory note for that amount, bearing interest at 4¼ percent and maturing in 20 years, together with its mortgage securing said note. Petitioner, on February 8, 1954, paid the then remaining balance of the $975,000 borrowed by it in 1949 from Prudential.

Petitioner, from the time of its payment of the prepayment penalty of $38,117 to Connecticut General through the year 1953, claimed on its income tax returns an amortization deduction of $1,905.85 each year. It also amortized other expenses (escrow fees, recording fees and the like) totaling $1,224.50, incurred in connection with the new financing, at the rate of $61.19 each year. When the petitioner paid off on February 8, 1954, the remaining balance of its 1949 loan from Prudential, it deducted in full on its 1954 Federal income tax return the remaining unamortized balance of the prepayment penalty, or $30,489.82.

Respondent disallowed the petitioner's amortization deduction of $1,967.04 ($1,905.85 plus $61.19) in 1953, and the deduction of the unamortized balance of the prepayment penalty in 1954 in the amount of $30,489.82, with the explanation that these amounts should have been deducted in full in 1949. The parties concede the only issue for 1953 is the correctness of the deduction of $1,905.85.

OPINION.

Petitioner argues that the prepayment penalty of $38,117 made to Connecticut General in 1949 was part of the cost of securing the Prudential loan, and as such it was amortizable over the 20-year term of the latter loan. Petitioner cites much authority for the proposition that expenditures made to secure a loan are amortizable over the life of the loan. However, here it is clear the expenditure was made to extinguish an existing indebtedness. It was not the payment of an item of cost to obtain new financing. Cf. *Olinger Mortuary Association*, 23 B.T.A. 1282. Undoubtedly the expenditure was necessary in order to secure the refinancing, in the sense that Prudential required the Connecticut General loan be extinguished, and the penalty payment was necessary in order to accomplish this result. This would make the penalty payment deductible in the year it was made or accrued but it would not make the payment a financing cost item in securing the new loan.

In a strikingly similar situation we have held, in the case of corporate refinancing, the *premium* paid on the early retirement of an old bond issue is deductible in full in the year of retirement, and this is true even though the funds for the retirement were procured from the sale of a new issue of bonds. *Bridgeport Hydraulic Co.*, 22 T.C. 215, affirmed per curiam 223 F. 2d 925; *Southern California Edison Co., Ltd.*, 4 T.C. 294; *Helvering* v. *Union Public Service Co.*, 75 F. 2d 723, affirming a Memorandum Opinion of this Court; *Helvering* v. *California Oregon Power Co.*, 75 F. 2d 644, affirming a Memorandum Opinion of this Court; *San Joaquin Light & Power Corporation* v. *McLaughlin*, 65 F. 2d 677.

We see no distinction between a *premium* paid to retire a bond issue or a mortgage loan before the maturity date, and a *penalty* paid by the obligor for the very same privilege, i.e., early retirement of the obligation. In each instance the nature of the payment is the same. Moreover, we deem it immaterial that the penalty is the result of negotiations between the mortgagor and the mortgagee, rather than a recited penalty in the indebtedness obligation for prior payment.

In *General American Life Insurance Co.*, 25 T.C. 1265, where this Court held that penalty payments received by the mortgagee from the mortgage debtors as a charge for prepayment were taxable as

"interest" to the mortgagee, we had occasion to analyze the nature of these prepayment penalties. We said, at page 1267:

However, we are persuaded that the respondent's argument here is right and that the penalties which mortgagors paid to [the taxpayer-mortgagee] for the privilege of using its money for a shorter period of time than that for which they originally borrowed the funds constituted, for all practical purposes, an additional interest charge for the use of such money for such shorter period. Clearly, penalty payments are a cost to the borrowers for using [the taxpayer-mortgagee's] money * * *

This analysis also serves to emphasize the similarity of *premium* payments and prepayment *penalties*, since in *San Joaquin Light & Power Corporation* v. *McLaughlin*, *supra*, the court said the premium paid by the taxpayer in 1922 for the early retirement of its 1920 bonded indebtedness represented "a part of the cost of the money procured in 1920."

We cannot agree with the petitioner that the new financing in 1949 was "so intimately tied in with the paying off of the old indebtedness that the two transactions cannot properly be deemed * * * as separate and independent transactions." In *Helvering* v. *California Oregon Power Co.*, *supra*, the issue was whether the *premium* paid on an early retirement of a bond issue (where the retirement was accomplished by using part of the proceeds of a subsequent bond issue) should, together with unamortized discount and expenses, be amortized over the life of the subsequent bond issue. The respondent in that case argued that the two issues were so interrelated that they must be treated as a unit, and that the items in dispute must be amortized over the life of the later bonds rather than immediately. The Court of Appeals for the District of Columbia, in affirming this Court, rejected this argument, saying that the "mere fact that funds were obtained by the [taxpayer] by means of the sale of the second bonds with which to pay the first bonds does not constitute the two several transactions as a unit." To the same effect, see *Bridgeport Hydraulic Co.*, *supra*, where the new bond issue was purchased in equivalent amounts by the same bondholders who had held the retired bond issue.

Certainly in the instant case, where the new and old mortgagees were different and unrelated parties, the two mortgage loans of the petitioner cannot be said to be so related that they must be regarded as a single unit. Nor do we regard it as significant that Prudential, the new mortgagee, was willing to pay a part of the prepayment penalty exacted by Connecticut General before it consented to petitioner's prepayment of the old mortgage loan. It is obvious that Prudential was merely willing to make this payment, as petitioner's witness expressed it, "as part of their cost of acquiring the loan." Neither this fact nor the fact that it was necessary to prepay the

old mortgage loan before the new loan could be obtained, impels a conclusion that the two transactions must be treated as a unit.

We hold that the prepayment penalty of $38,117 paid by petitioner to Connecticut General in order to prepay an outstanding mortgage loan was properly deductible in full in the year when paid, and that it was not amortizable over the life of the new mortgage loan obtained from Prudential.

*Decision will be entered under Rule 50.*